UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| MILLER'S PRECISION | ) | |
| ENTERPRISES, INC., d/b/a | ) | |
| GARMENT RECOVERY SYSTEMS, | ) | |
| an Indiana corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:04 CV 18 |
| | ) | |
| REALM CONNECT CORPORATION, | ) | |
| d/b/a AUCTIONET.COM, | ) | |
| a California corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM and ORDER**

**I. BACKGROUND**

This matter is before the court on plaintiff's "Motion for Default Judgment."

(Docket # 11.) Plaintiff is an Indiana corporation in the business of recycling Tyvek®

garments. (Tepperman Aff., docket # 14, ¶¶ 2-4.) In early May of 2003, plaintiff's

president, Robert Tepperman, was approached by a broker about bidding on a set of

over 47,000 cases of Tyvek® from AuctioNet.com, a bonded auction company.

(Tepperman Aff. ¶ 9.) Tepperman allowed the broker to make a bid on behalf of the

company. (Tepperman Aff. ¶ 12.) Tepperman indicated that he would pay only after an

opportunity to confirm that the material was in fact Tyvek®. (Tepperman Aff. ¶ 11.)

The broker made a bid, and AuctioNet.com accepted it. (Tepperman Aff. ¶ 12-13.)

On May 7, 2003, Tepperman traveled to Dallas, Texas, and was allowed to inspect a sample of the goods. (Tepperman Aff. ¶ 19.) Satisfied with the quality of the sample, Tepperman tendered a check for $9,987 to defendant on behalf of the company. (Tepperman Aff. ¶ 16; Pl.'s Ex. 3.) Tepperman also received an invoice for the 47,000-odd cases of goods, which were to be removed from a Texas warehouse by the end of May. (Tepperman Aff. ¶ 21; Pl.'s Ex. 7.) That same day, Tepperman issued a company check for $15,000 to his broker as a fee for arranging the deal. (Tepperman Aff. ¶ 17; Pl.'s Ex. 4.)

Throughout the month of May, Tepperman communicated extensively with Greg Quiroga, a representative of AuctioNet.com, about logistics involved with the pick-up that was to happen at the end of the month. (Tepperman Aff. ¶¶ 21-25; Pl.'s Ex. 6, 8.) Tepperman planned to ship the garments to India to be processed and recycled. (Tepperman Aff. ¶ 22.) Tepperman transported a company manager from India to Indiana in order to train him for receiving and overseeing the processing of the large shipment of garments. (Tepperman Aff. ¶ 37; Pl.'s Ex. 13-14.) He also rented fourteen 40-foot cube ocean freight containers to ship the garments. (Tepperman Aff. ¶ 22; Pl.'s Ex. 12.) Additionally, he hired thirteen laborers to move the cases of goods out of the Texas warehouse and into the ocean freight cubes. (Tepperman Aff. ¶¶ 23, 29; Pl.'s Ex. 11.)

On May 27, 2003, Tepperman traveled to Arlington, Texas, to coordinate the pick-up that would take place the next day. (Tepperman Aff. ¶¶ 26-27; Pl.'s Ex. 9, 10.)

On May 28, 2003, after the laborers had worked for one hour, plaintiff discovered that only 1,900 cases of goods were available for pick-up. (Tepperman Aff. ¶ 28.) Plaintiff immediately reloaded the goods back into the warehouse, returned the ocean freight cubes, and sent the laborers home. (Tepperman Aff. ¶¶ 28-29.)

Over the course of the next few days, AuctioNet.com confirmed that the only goods available were the 1,900 cases in the Texas warehouse. (Tepperman Aff. ¶ 31.) Tepperman informed the broker that the deal had gone bad, and the broker refunded $1,500 of his fee. (Tepperman Aff. ¶ 32.) In June, AuctioNet.com shipped the 1,900 cases of garments to plaintiff's warehouse, without notice to or the consent of plaintiff. (Tepperman Aff. ¶ 33.) Plaintiff has since been storing the goods in its warehouse while awaiting the outcome of this litigation, but suggests that it would now be willing to keep the goods and have their value deducted from any judgment received against defendant. (*See* Tepperman Aff. ¶ 38.)

Plaintiff filed a complaint against defendant on January 12, 2004, alleging that defendant had breached its contract for the sale of the approximately 47,000 cases of Tyvek® garments. (Compl., docket # 1.) Defendant was served with process on May 20, 2004, but failed to file an appearance or answer plaintiff's complaint. (Exec. Summons, docket # 6.) On October 13, 2004, the Clerk entered defendant's default at plaintiff's request. (Docket # 9-10.) That same day, plaintiff filed the present motion for the court to enter default judgment against defendant. (Docket # 11.) In an order dated October 21, 2004, the court reserved ruling on plaintiff's motion until sufficient evidence was

before the court to ascertain damages. (Order, docket # 12.) Plaintiff submitted a "Brief

in Support of Damages" and its accompanying evidentiary support on November 22,

2004. (Docket # 13, 14.) Plaintiff claimed it was entitled to "compensatory/restitution

damages," "incidental/reliance damages," and consequential damages in the form of

lost profits. (Pl.'s Br. Supp. Damages 8-10.) In an order dated August 23, 2005, the court

ordered plaintiff to file additional documents substantiating its claim for lost profits.

(Order, docket # 15.) Instead of doing so, plaintiff filed a "Withdrawal of Claim for Lost

Profits" (docket # 16), which Magistrate Judge Cherry properly construed as a motion

to withdraw a claim for lost profits and subsequently granted. (Order, docket # 17.)


## II. ANALYSIS

Default judgment in this case is appropriate because plaintiff has satisfied all the

necessary preconditions to being granted default judgment under FED. R. CIV. P. 55.

Plaintiff's pleadings clearly establish the formation of a contract on May 7, 2003, and a

breach on May 28, 2003. The only question remaining is: What is the proper measure of

damages?

The Uniform Commercial Code (hereinafter "UCC"), as adopted by the Indiana

legislature, provides a remedial scheme to assist a buyer seeking to recover from a seller

who has failed to deliver goods as promised. *See generally* IND. CODE 26-1-2-711 *et seq.*

This scheme accomplishes two objectives: (1) protecting the buyer's expectation interest

by putting him in the position he would have been in had the seller not breached and

4

the deal had proceeded as agreed, through an award of cover/market, incidental, and

consequential damages, including lost profits (IND. CODE 26-1-2-712, 713, 715); and (2)

providing restitution by divesting the seller of any of the purchase price already paid by

the buyer (IND. CODE 26-1-2-711).

Plaintiff's "kitchen sink" prayer for damages can be broken down into four basic

categories: (1) pre-contract expenses (the cost of traveling to inspect the goods on May 7,

2003), (2) the purchase price paid; (3) post-contract but pre-breach expenses (i.e., the

costs of preparing to handle and process the goods); and (4) post-breach expenses (i.e.,

the costs incurred subsequent to plaintiff's discovery that the seller had breached the

contract).

The court will return to the first category in a moment. As to the second category,

presumably plaintiff could recover the purchase price paid as restitution under section

2-711. As to the fourth category, because incidental damages are those expenses

"resulting from the seller's breach," such as the costs of "inspection, receipt,

transportation, and care and custody of goods rightfully rejected," IND. CODE 26-1-2-

715(1), plaintiff could recover the last category of expenses requested: the costs incurred

subsequent to plaintiff's discovery that the seller had breached the contract. So far so

good, under the UCC.

However, the third category of requested damages (the costs of preparing to

handle and process the goods) presents a problem. The court does not consider these

market or cover damages, since they do not involve purchasing alternative goods or

measuring plaintiff's losses by comparisons of the contract price to market prices. They

are also not incidental or consequential damages resulting from the breach. *See*

*Delhomme Indus., Inc. v. Houston Beechcraft, Inc.,* 735 F.2d 177, 185-86 (5th Cir. 1984) ("An

expense will not ordinarily be considered as an item of incidental or consequential

damage . . . when the buyer would have incurred the claimed expense even if the

product or goods had been as warranted.") Rather, they seem to be expenditures made

*in reliance* on the contract.

Unfortunately, the Code does not expressly provide a mechanism for protecting

the buyer's reliance interest. *See* Michael T. Gibson, *Reliance Damages in the Law of Sales*

*Under Article 2 of the Uniform Commercial Code,* 29 ARIZ. ST. L.J. 909 (1997); ROY RYDEN

ANDERSON, DAMAGES UNDER THE UNIFORM COMMERCIAL CODE, § 14.1, 3 (2005). In the

usual sales case governed by the Code, the buyer will seek an award of lost profits, and

presumably any preparatory costs of doing business will be recouped from this award,

mirroring what would happen if the deal had actually gone through as planned. The

buyer's expectation interest is fully protected, but he is not placed in a better position

than he would have been if the contract had been fully performed.

Of course, this is not the usual case. Plaintiff has withdrawn his prayer for lost

profits, but he still expects to recover the costs of preparing to handle and process the

promised goods, not as expenses that are covered by his profits, but through an award

of reliance damages. However, it seems plaintiff cannot do so by relying on the

remedial scheme set forth in the Code. To award plaintiff his expenditures made in

6

reliance on the deal, one must look outside the Code. The first order of business, then, is determining whether it is permissible to do so.

Principles of law and equity are preserved as supplemental to the provisions of the Code, unless displaced by particular Code provisions. IND. CODE 26-1-1-103. The Indiana courts have not directly stated whether the expectation and restitutionary damages provisions of the Code, as adopted by the Indiana legislature, have displaced reliance damages to the extent that they are no longer an alternative option for aggrieved buyers in contracts for the sale of goods. The Indiana Court of Appeals has stated that "the damages sections of Article II of the Indiana Uniform Commercial Code are applicable (2-711, et seq.) but not exclusive," *Ertel v. Radio Corp. of Am.,* 354 N.E.2d 783, 785 (Ind. Ct. App. 1976), although later, in a footnote, it described that statement as dicta. *Michiana Mack, Inc. v. Allendale Rural Fire Protection Dist.,* 428 N.E.2d 1367, 1372 n.13 (Ind. Ct. App. 1981). Additionally, the Indiana Court of Appeals has stated that other parts of the Code dealing with the buyer's remedies do not provide the exclusive method of ascertaining damages. For example, although IND. CODE 26-1-2-714 provides a method for measuring damages in a breach of warranty case, the Indiana Court of Appeals has recognized three alternative methods. *Michiana Mack,* 428 N.E.2d at 1370.

A comment accompanying section 2-711 states: "The remedies listed here are those available to a buyer who has not accepted the goods or who has justifiably revoked his acceptance." IND. CODE 26-1-2-711, cmt. 1. In isolation this would suggest that perhaps 2-711 was intended to displace all other remedies available to the buyer.

However, the next sentence suggests otherwise: "The remedies available to a buyer

with regard to goods finally accepted appear in the section dealing with breach in

regard to accepted goods." *Id.* Thus, the two sentences together serve a roadmapping

function, informing a reader that the Code remedies relevant to a given situation will

depend on whether the goods were accepted or not. Therefore, the court does not find

the comment illuminating on the issue of whether the damages provisions of the Code

were intended to displace all other possible methods of determining damages.

According to one UCC scholar, section 1-103 has preserved the common law

grounds warranting the recovery of reliance damages:

> Unless displaced by a specific provision of the Code, the general principles of law and equity pertaining to the law of contract are preserved for Code cases by Section 1-103. . . . Although the Code says nothing per se about reliance damages, the common law of contract allows for damages to be measured by the reliance interest in two well established categories of cases[,] actions based on promissory estoppel . . . [and] actions where the injured party is unable to prove with reasonable certainty his lost expectation damages. These categories are presumably preserved by Section 1-103 of the Code.

ROY RYDEN ANDERSON, DAMAGES UNDER THE UNIFORM COMMERCIAL CODE, § 14.3 (2005).

Anderson further notes:

> The lack of applicable Code cases to date indicates that parties to transactions in goods . . . will have little occasion to maintain an action merely for reliance expenditures. This is undoubtedly attributable to the broad panorama of damage remedies provided to sellers and buyers by the Code, to the liberal Code rules regarding certainty of proof, and to the ease of proving market value for purposes of computing damages. Rare will be the case in which the aggrieved seller or buyer cannot prove direct damages that exceed his reliance expenditures.

The court finds this viewpoint to be a reasonable and persuasive one. The text of the Code and its accompanying comments do not suggest that the Code displaces all of a buyer's alternative common law and equitable remedies. Further, the Indiana Court of Appeals has suggested in dicta that the buyer's remedies outlined in the Code do not comprise an exclusive set. Accordingly, the court finds that, under section 1-103, reliance damages are still available as supplemental to the Code's remedies. Plaintiff could thus be awarded reliance damages as an alternative to the Code's expectation/restitutionary measure of damages, given the difficulty of establishing lost profits in this case.

"The reliance recovery is a reimbursement for losses the plaintiff suffers in reliance on the defendant's contractual promise." DAN B. DOBBS, 3 LAW OF REMEDIES 51 (1993). The basic thrust of the reliance measure of damages is to put the plaintiff in the same position he would have been in had the contract never been formed. RESTATEMENT OF CONTRACTS § 344 (1981). In this case, plaintiff should be reimbursed for the series of expenses that were incurred in reliance on the deal: the purchase price paid; the fee paid to the broker; the cost of transporting and training an employee to handle the goods; the cost of the trip taken to supervise the pick-up of the goods; the cost of laborers hired to handle the goods; the cost of renting the ocean freight cubes to ship the goods; and the cost of storing almost 2,000 cases of goods, which defendant later shipped to plaintiff's warehouse, for 31 months (the time period between breach and the resolution of this lawsuit).

The court now returns to the first category of expenses requested by plaintiff: the pre-contract expense of traveling to inspect the goods on May 7, 2003. The costs involved with the process of deciding whether to enter into a contract are not recoverable. *See Marsh v. S. Atl. Casket Co.,* 115 S.E. 502, 503 (Ga. App. 1923) (costs of travel during negotiations of contract not recoverable in action for breach); *Halliday v. Lesh,* 85 Mo. App. 285 (1900) (cost of seller's travel to buyer's place of business to sell him goods not recoverable in action for breach). Because plaintiff conditioned his assent to the deal on an opportunity to inspect the goods, the parties' agreement was not formed until May 7, 2003, when plaintiff's president, satisfied with the quality of the sample shown, wrote a check to defendant and defendant gave plaintiff an invoice. Had plaintiff been unsatisfied with the goods after inspecting them on May 7, 2003, he would have been able to walk away with no contract having been formed, but he still would have incurred travel expenses to make the inspection.

Defendant is entitled to a credit for any benefit plaintiff has received from the failed transaction. DOBBS, *supra,* at 51. Plaintiff immediately rejected the goods upon learning that the number of cases promised were not present at the warehouse for unloading. Later, defendant shipped the rejected goods to plaintiff. Plaintiff appears to intend to retain the rejected goods as a benefit, since a deduction for the value of the rejected goods, which are now in plaintiff's hands, was provided in plaintiff's own damages computation. Therefore, since plaintiff intends to keep the benefit of 4% of the total lot of promised goods, the court will credit defendant with $405.47 (4% of $9,987,

10

the purchase price plaintiff paid for the total lot). Plaintiff also recouped $1,500 from his

broker after informing him that the transaction had failed; defendant is therefore

entitled to a credit in that amount.

Plaintiff also seeks prejudgment simple interest at a rate of 8% from the date of

the breach. (Pl.'s Br. Supp. Damages 8-9, 10.) "An award of prejudgment interest in a

contract claim is warranted if the terms of the contract make the claim ascertainable and

the amount of the claim rests on mere mathematical computation." *Firstmark Standard

Life Ins. Co. v. Goss,* 699 N.E.2d 689, 693 (Ind. Ct. App. 1998). "The award is considered

proper when the trier of fact need not exercise its judgment to assess the amount of

damages." *Noble Roman's, Inc. v. Ward,* 760 N.E.2d 1132, 1140 (Ind. Ct. App. 2002). "[A]n

award of prejudgment interest is generally not considered a matter of discretion." *Olcott

Intern. & Co., Inc. v. Micro Data Base Sys., Inc.,* 793 N.E.2d 1063, 1078 (Ind. Ct. App. 2003).

When parties to a contract do not specify the rate of interest to be used, the court is to

employ the statutory rate of 8%. *Thor Elec. Inc. v. Oberle & Assocs., Inc.,* 741 N.E.2d 373,

380 (Ind. Ct. App. 2000). Prejudgment interest is only recoverable on the balance due,

where defendant is entitled to an offset. *Koppers Co., Inc. v. Inland Steel Co.,* 498 N.E.2d

1247, 1256 (Ind. Ct. App. 1986). Because the amount of damages to be awarded in this

case rests on a mere mathematical computation, and not the exercise of the court's

judgment, the court grants plaintiff's request for 8% simple interest on $32,243.74

($2,579.50 per year, or  $214.96 per month), for 31 months, totaling $6,663.76.

In sum, plaintiff is entitled to recover the following:

| | |
|---|---|
| Purchase price paid | $ 9,987.00 |
| Transportation and lodging of employee for training | $ 2,161.92 |
| Plaintiff's transportation to Texas for pick-up of goods | $    236.50 |
| Plaintiff's lodging in Texas for pick-up of goods | $      69.95 |
| Laborers hired to handle the goods | $    693.84 |
| Ocean freight cubes to ship the goods | $    900.00 |
| Storage of goods later shipped by defendant | $ 5,100.00 |
| Broker's fee | $15,000.00 |
| Credit for refund from broker | -  $ 1,500.00 |
| Credit for value of goods in plaintiff's possession | -  $    405.47 |
| *Subtotal* | $32,243.74 |
| | |
| Subtotal | $32,243.74 |
| Prejudgment interest on subtotal | $ 6,663.76 |
| ***Total*** | ***$38,907.50*** |

## III. CONCLUSION

For the foregoing reasons, plaintiff's motion for default judgment (docket # 11) is

**GRANTED**. The Clerk is to **ENTER FINAL JUDGMENT** in this case, stating:

"Judgment is entered in favor of plaintiff Miller's Precision Enterprises, Inc., d/b/a

Garment Recovery Systems, and against defendant Realm Connect Corp., d/b/a

AuctioNet.com, in the amount of $38,907.50."

**SO ORDERED.**

**ENTER:** December 22, 2005

s/ James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT